IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BADGER MINING CORPORATION,

                        Plaintiff,                          OPINION AND ORDER

    v.                                                  19-cv-840-wmc

FIRST AMERICAN TITLE INSURANCE
COMPANY,

                        Defendant.

In this insurance dispute, plaintiff Badger Mining Corporation ("Badger") alleges that defendant First American Title Insurance Company ("First American") breached its policy by failing to provide a defense to an underlying lawsuit challenging Badger's title to property. Plaintiff also asserts a bad faith claim against defendant. Before the court are the parties' cross motions for summary judgment. (Dkt. ##45, 48.) For the reasons that follow, the court will grant in part and deny in part both parties' motions as to the breach of contract claim, finding that defendant had a duty to defend at least some of the claims in the underlying action. The court will also deny plaintiff's motion as to its bad faith claim and reserve on both parties' motions as to damages, which will require further exploration at trial.[1]

---

[1] Plaintiff also filed a motion for judgment on the pleadings (dkt. #28), which the court will grant in part and deny in part for the same reasons as its rulings on the parties' motions for summary judgment.

UNDISPUTED FACTS[2]

**A. Issuance of Title Insurance**

Plaintiff Badger is a Wisconsin corporation, with its principal place of business in Berlin, Wisconsin, engaged in the business of mining and selling sand, among other things. Defendant First Amendment is a Nebraska corporation, with its principal place of business in Santa Ana, California, engaged in the business of underwriting and issuing title insurance.

On April 13, 2015, Badger purchased certain assets from Northern Frac Proppants II, LLC ("NFP II"), including real estate located in Alma Center, Jackson County, Wisconsin, commonly known as "Goose Landing."  The Goose Landing real estate was conveyed to Badger by warranty deed.  At the time of that purchase, there was already an operating mine on the property, primarily for sand suitable for hydraulic fracturing ("frac sand").

In connection with its purchase of the Goose Landing real estate, Badger sought and acquired title insurance from First American, issued as Owners Policy of Title Insurance No. 5011400-85421, on April 16, 2015.  (Compl., Ex. A (dkt. #1-1) ("the Policy").)  In relevant part, the Policy provides that:

> FIRST AMERICAN TITLE INSURANCE COMPANY . . .
> (the "Company") insures, as of Date of Policy, and, to the
> extent stated in Covered Risks 9 and 10, after Date of Policy,
> against loss or damage, not exceeding the Amount of
> Insurance, sustained or incurred by the Insured [Badger] by
> reason of:
> . . .

---

[2] Unless otherwise noted, the court finds the following facts material and undisputed.

2. Any defect or lien or encumbrance on the Title.   The Covered Risk includes but is not limited to insurance against loss from
(a) A defect in the Title caused by
(i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
(ii) failure of any person or Entity to have authorized a transfer or conveyance;
. . .

9.  Title being vested other than as stated in Schedule A or being defective
(a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws[.]

(Policy 2-3 (bolding removed).)[3]

In addition to defining the scope of coverage, the Policy also defines express exclusions from coverage under the Policy, for which First American "will not pay loss or damage, costs, attorneys' fees, or expenses," including the following that are material to the parties' dispute if "aris[ing] by reason of:"

3.  Defects, liens, encumbrances, adverse claims, or other matters
(a) created suffered, assumed, or agreed to by the Insured Claimant;
. . .
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' right laws, that the transaction vesting the Title as shown in Schedule A, is
(a) a fraudulent conveyance or fraudulent transfer;

---

[3] Plaintiff points out, and it is undisputed, that the Policy also covers "Unmarketable Title," but that provision appears only marginally relevant to the parties' dispute. (Pl.'s PFOFs (dkt. #50) ¶¶ 10-11 (citing Policy 2, 4).)

. . .

(*Id.*)

With respect to providing a duty to defend, the Policy also states:

> 5.  Defendant and Prosecution of Actions
> (a) Upon written request by the Insured . . . the Company, at
> its own cost and without unreasonable delay, shall provide for
> the defense of the insured in litigation in which any third party
> asserts a claim covered by this policy adverse to the Insured.
> This obligation is limited to only to those stated causes of
> action alleging matters insured against by this policy. . . . The
> Company will not pay any fees, costs, or expenses incurred by
> the Insured in the defense of those causes of action that allege
> matters not insured against by the policy.

(*Id.*)

## B.  Underlying Litigation

On August 22, 2017, several persons and entities commenced an action in Trempealeau County Circuit Court against Badger and other defendants.  (Compl., Ex. B ("Underlying Compl.") (dkt. #1-2).)  *See 2011 NF Holdings, LLC f/k/a NF Holdings, LLC v. Northern Frac Proppants II, LLC*, No. 2017-CV-126 (Trempealeau Cnty., Wis. Cir. Ct.). The underlying plaintiffs included Northern Frac Proppants, LLC ("NFP"), which was, allegedly at least, legally separate and apart from NFP II -- the entity that purported to sell the Goose Landing real estate and other assets to Badger.  According to the complaint, NFP was formed on December 20, 2012.  The underlying defendants include Badger, NFP II, Jeffries Alston, who was CEO of NFP *and* NFP II, as well as the latter's President.

Although confusing and somewhat contradictory, the underlying complaint alleged that NFP had acquired "interests" in the Goose Landing real estate and associated assets

4

in 2013, and later that year, Jeffries Alston converted those assets of NFP and made them part of NFP II.  More specifically, the underlying complaint alleged that on October 30, 2013, Alston prepared an Assignment Agreement assigning all of NFP's rights, titles and interest in Goose Landing assets to NFP II.  Alston signed the agreement as President of both NFP and NFP II.  While the dates are also confusing, the underlying complaint further alleges that on November 12, 2013, NFP II made an offer to purchase "Goose Landing" from its then owners, James and Andrea Hoffman, and that on December 20, 2013, NFP II finalized that acquisition.

Nevertheless, the underlying plaintiffs alleged that Goose Landing real estate and its other assets were "rightfully owned by NFP," and NFP II and its members defrauded the underlying plaintiffs in acquiring those assets.  (Pl.'s PFOFs (dkt. #40) ¶ 25 (citing Underlying Compl. (dkt. #1-2) ¶¶ 190-236, 290-334, 390-98).)  The underlying plaintiffs did *not* allege that Badger had any involvement in the assignment or transfer of interests in Goose Landing from NFP to NFP II in 2013.  Instead, they alleged that Badger first explored acquiring Goose Landing in 2014, entered into an exclusive option to purchase all of NFP II's assets, including Goose Landing on March 13, 2015, for $150 million, and ultimately closed on that purchase on April 13, 2015, for $85 million.

The underlying complaint contains a total of seventeen causes of action, at least half of which allege that the transfer of NFP's assets, including the Goose Landing interests, to NFP II in 2013 was fraudulent and seeking "avoidance of the transfers," "an attachment of the interests transferred," and/or entering a judgment declaring the conveyances to be void; it also alleged a "defect in the Title caused by . . . fraud" or failure of the true owner

"to have authorized a transfer." (Pl.'s PFOFs (dkt. #50) ¶¶ 28-33 (quoting Underlying Compl. (dkt. #1-2) (Counts Two, Three, Four, Eight, Eleven).) Relatedly, in Count Fifteen, the underlying plaintiffs assert a claim for unjust enrichment based on Badger having acquired property that the underlying plaintiffs allege is rightfully theirs; in Count Seven, the underlying plaintiffs assert a claim of conversion based on these same facts; and in Count Seventeen, the underlying plaintiffs seek a constructive trust, including the property held by Badger. (Id. ¶ 35.)[4]

The underlying complaint further asserts that NFP II then "sold the new company to Badger Mining Corporation for a 'pawn shop' price—a price negotiated because Badger knew it was buying 'fenced' goods." (Def.'s PFOFs (dkt. #47) ¶ 13 (citing Underlying Compl. (dkt. #1-2) cm/ecf p.8).) As part of this assertion, defendant sets forth in great detail additional allegations in the underlying complaint about Badger's conduct with respect to the transfer of the Goose Landing real estate from NFP II to Badger, although the court need not recount all of these underlying allegations for purposes of deciding the contract issue before it. Of particular relevance, however, the underlying plaintiffs alleged that "Badger knew -- as a result of its [due] diligence -- that virtually all of assets that Alston claimed he wanted [to sell] them under NFP II were actually titled to and owned by NFP"; that despite this knowledge, "Badger was committed to acquiring the assets due to their intrinsic value, which dwarfed the purchase price of $150 million under the No-Shop

---

[4] One of the underlying plaintiffs also recorded a lis pendens against Badger's Goose Landing real estate, which Badger was served with on August 24, 2017.

Agreement"; and that as part of the negotiation, Badger "insisted in the NFP II/Badger APA that the parties set aside $8.5 million of the purchase price in escrow to indemnify North Cliff/Badger from the lawsuits that both parties knew would be forthcoming." (Underlying Compl. (dkt. #1-2) ¶¶ 244, 247, 267.)

In addition to the causes of action described above that focused on the transfer of NFP's assets to NFP II in 2013, the underlying complaint also asserts a fraudulent transfer based on NFP II's sale to Badger cause of action (Count Five), a conspiracy claim against all defendants (Count Twelve), a disgorgement cause of action concerning Badger's "assistance, aiding and abetting, and knowing participation in the NFP II Defendants['] conduct alleged herein" (Count Sixteen), and a claim for constructive trust against Badger also based on the same alleged conduct (Count Seventeen).  (Def.'s PFOFs (dkt. #47) ¶ 14 (citing Underlying Compl. (dkt. #1-2) ¶¶ 347-48, 401, 433-34, 439).)

### C. First American's Refusal to Defend and Costs of Defense

On September 5, 2017, Badger notified First American of the underlying action in writing and provided a copy of the summons and complaint.  (Compl., Ex. C (dkt. #1-3).) On October 27, 2017, Beth Schreiber, Vice President and Senior Claims Counsel for First Amendment, sent a letter to Attorney Ronald Ragatz, counsel for Badger, denying coverage on the basis that allegations in the complaint -- particularly allegations that Badger was a "knowing, active, and willing participant in the Defendants' fraudulent scheme," among other related allegations -- fall within the Policy's exclusions.  (Compl., Ex. D (dkt. #1-4).) On this basis, First American also declined to undertake the defense of Badger or to reimburse Badger's defense costs, although neither First American nor Badger sought a

judicial determination at that time regarding any duty to cover or defend.

Accordingly, Badger proceeded to defend itself in the underlying litigation through its already retained attorneys at DeWitt LLP.  After nearly two years of litigation, the underlying action was resolved by settlement and dismissed on June 21, 2019.  Among other things, the settlement agreement contained a reservation of Badger's rights to pursue a claim against First American for amounts paid in defense or indemnity.[5]  The settlement agreement also provided for a payment to the underlying plaintiffs of $15 million, of which Badger contributed $200,000, in two checks distributed through its counsel on June 14, 2019.  Under the terms of the agreement, the underlying plaintiffs further relinquished any right, title or interest in Goose Landing, as well as released the lis pendens on the real estate.

In addition to the $200,000 in payments, Badger incurred $1,011,500.04 in attorneys' fees and costs for the defense of the underlying litigation.  The vast majority of those fees and costs -- $832,377.78 -- are attributable to DeWitt's work as documented by 23 monthly invoices, all of which Badger paid in full.[6]  Defendant does not dispute that these invoices reflect DeWitt's work, except to point out that two entries that reflect work on Badger's potential dispute with First American, rather than on Badger's defense in the underlying litigation.   (Def.'s Resp. to Pl.'s PFOFs (dkt. #55) ¶ 55.)   DeWitt further

---

[5] The settlement agreement also provided that Badger could disclose the agreement for purposes of pursuing its claim against First American.

[6] Plaintiff points out that one of the invoices reflects some time spent on the case *before* Badger tendered its defense to First American on September 5, 2017, for which it is *not* seeking reimbursement.  (Pl.'s PFOFs (dkt. #50) ¶ 56.)

represents that the rates it charged to Badger for the three attorneys who worked on the underlying action represent "the rates regularly billed and paid by Badger and other typical DeWitt clients, and the rates are consistent with general market rates for legal services in Dane County, Wisconsin," which defendant also does not dispute.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #50) ¶ 77.)

In addition to DeWitt, plaintiff incurred fees and costs from two other firms -- Chier Law Office LLC and Gray Reed -- and an outside expert.   Operating as an LLC, Attorney Matthew G. Chier acts as Badger's outside general counsel and was involved in the 2015 purchase of NFP II's assets.  Chier works on a monthly retainer for Badger, and he determined that the portion of his work attributable to the underlying action through July 2019 was $46,620.  Defendant disputes that this is an accurate attribution in light of Chier's failure to offer his actual billing records or other time entries with his declaration. Regardless of this challenge, there is no dispute that Badger paid Attorney Chier's monthly retainer, including the fees that he now attributes to defense of the underlying litigation. Badger also incurred attorney fees and costs of $18,802.94 from Gray Reed, a Texas firm that previously represented Badger against a complaint filed in Texas that was similar to the one filed in the underlying action in Wisconsin, but was successfully dismissed for lack of personal jurisdiction.  At the outset of the underlying action, DeWitt coordinated with Gray Reed to transition the dispute from Texas to Wisconsin, including evaluating early strategy issues and questions of privilege, along with transferring the document repository. Gray Reed's nine invoices were all paid for out of money that Badger had placed in trust with Gray Reed.  Finally, Badger also paid the John T. Boyd Company $113,699.32 for an

9

expert opinion on Badger's behalf regarding the value of the assets that Badger purchased in the 2015 transaction.  Badger paid John T. Boyd Company's four invoices directly and in full as well.

Of these costs, Badger has already received reimbursement of $779,561.12 paid toward its defense in the underlying lawsuit from a Liability Escrow Account created as part of Badger's 2015 purchase of Goose Landing from NFP II as set forth in the parties' asset purchase agreement.  Moreover, that agreement does not provide NFP II with any right of subrogation arising from payments from the Liability Escrow Account; and even if it had, NFP II fully released any claim it had against Badger and its insurers in the settlement agreement of the underlying action.

Badger also received a check in the amount of $160,501.66 from Badger's general commercial liability carrier, Hartford Insurance Company of the Midwest, as reimbursement of defense costs, although Badger argues that it did not actually recoup that amount, since the policy with Hartford is actually a "captive insurance agreement," in which Badger established total funds in the amount of $215,926.00 to be applied against claims made under the policy.  Because of this, Badger contends that the Hartford payment was nothing more than "a direct cost borne by Badger."  (Pl.'s PFOFs (dkt. #50) ¶ 72.) While defendant disputes this characterization, the court will address the parties' respective positions below.  Regardless, the policy does not provide Hartford with any right of subrogation arising from payments made under the policy, and Hartford has also released any claim against Badger and its insurers in the underlying settlement agreement, as well as agreed to Badger pursuing this claim against First American.  (Ragatz Sec. Decl.,

10

Ex. 1 (dkt. #12-1) ¶ 22 ("To the extent Badger Mining's claim [against First American] includes amounts initially paid by Hartford for which Hartford was subsequently reimbursed, Hartford agrees that Badger Mining may pursue such claim.").)

## OPINION

In this lawsuit, plaintiff Badger asserts claims for breach of contract to defend and bad faith, both arising out of defendant's refusal to defend the underlying lawsuit brought against it.  As previously explained, the parties filed cross-motions on both claims.  In addition, to the extent the court finds liability, the parties have also briefed issues concerning damages.  The court will take up each claim, then turn to the question of damages.

## I.  Breach of Contract

Just like other contracts made in Wisconsin, insurance policies are interpreted to effectuate the contracting parties' intent.  *Water Well Sols. Serv. Grp., Inc. v. Consolidated Ins. Co.*, 2016 WI 54, ¶ 14, 369 Wis. 2d 607, 881 N.W.2d 285 (citing *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65).[7]  However, the court interprets an insurance policy's terms "as a reasonable person in the position of the insured would understand the language."  *Id.* (citing *Estate of Sustache v. Am. Fam. Mut. Ins. Co.*, 2008 WI 87, ¶ 19, 311 Wis. 2d 548, 751 N.W.2d 845).

Further, an "insurer has a duty to defend when the allegations, if proven, give rise

---

[7] Given the parties' mutual reliance on Wisconsin law in their respective submissions, the court will apply Wisconsin law.  Regardless, there does not appear to be another forum with a significant relationship to the insurance contract in dispute.

to the possibility of recovery under the terms of the policy." *Air Eng'g, Inc. v. Industrial Air Power, LLC*, 2013 WI App 18, ¶ 10, 346 Wis. 2d 9, 828 N.W.2d 565 (citing *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 93, 261 Wis. 2d 4, ¶ 19, 660 N.W.2d 666). In assessing this duty, the court "compare[s] the four corners of the underlying complaint to the terms of the entire insurance policy." *Water Well Sols.*, 2016 WI 54, ¶ 14 (internal citations omitted). Moreover, in applying this "four corners" test, the court "must liberally construe the allegations contained in the underlying complaint, assume all reasonable inferences from the allegations made in the complaint, and resolve any ambiguity in the policy terms in favor of the insured." *Id.* at ¶ 15 (citing *Sustache*, 2008 WI 87, ¶ 21). Finally, "[t]he legal label applied to the claim is not determinative; what matters is whether the conduct alleged in the complaint is arguably within a category of wrongdoing covered by the policy." *Air Eng'g*, 2013 WI App 18, ¶ 10 (citing *Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994)).

Accordingly, the underlying complaint and the insurance policy are the only documents relevant to the court's coverage analysis. *Marks v. Houston Cas. Co.*, 2016 WI 53, ¶ 39, 369 Wis. 2d 547, 881 N.W.2d 309 (citing *Fireman's Fund*, 2003 WI 33, ¶ 19). The court must first decide if the insurance policy language covers the complaint's allegations. *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Sustache*, 2008 WI 87, ¶ 22). If not, that is the end of the inquiry, and the insurer has no duty to defend. *Id.* (citing *Sustache*, 2008 WI 87, ¶ 22). On the other hand, if the allegations fall within the policy's coverage grant, then the court must determine whether a policy exclusion precludes coverage. *Id.* (citing *Sustache*, 2008 WI 87, ¶ 23). If no exclusion applies to preclude

coverage, then the insurer has a duty to defend unless "an exception to the exclusion applies to restore coverage." *Id.* (citing *Sustache*, 2008 WI 87, ¶ 23). Absent such an exception, however, the insurer has no duty to defend. *Id.* (citing *Am. Girl, Inc.,* 2004 WI 2, ¶ 24).

Just as with the terms of coverage, a court interprets an insurance policy exclusion as a reasonable person in the position of the insured would understand the exclusion language, and if the exclusion is ambiguous, "it will be construed in favor of coverage." *Phillips*, 2013 WI 105, ¶ 15 (citations omitted). Thus, just as coverage is broadly construed in favor of the insured, exclusions are "narrowly construed against the insurer." *Lexington Ins. Co. v. Tudor Ins. Co.*, No. 11-C-809, 2013 WL 461279, at *5 (E.D. Wis. Feb. 6, 2013) (citing *Day v. Allstate Indem. Co.*, 332 Wis. 2d 571, 798 N.W.2d 199, 206 (2011)). At the same time, an exclusion's exception cannot create coverage that does not exist under a reasonable reading of the policy's initial coverage grant. *Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶ 15, 342 Wis. 2d 311, 818 N.W.2d 819.

As for the *scope* of the duty to defend, however, title insurance does differ from other insurance policies in one important respect. Generally, if an insurance policy provides coverage for one claim in the underlying suit, then the insurer must defend all claims alleged. *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Fireman's Fund*, 2003 WI 93, ¶ 21). In contrast, "title insurance only indemnifies against losses incurred by reason of defects in title and specifically limits the insurer's duty to defend to claims that are within the policy's coverages." *Philadelphia Indemnity Insurance Company v. Chicago Title Insurance Company*, 771 F.3d 391, 394 (7th Cir. 2014). For example, in *Philadelphia Indemnity*, the title insurance

13

policy contained a defense provision similar to that at issue here, requiring the title company to "provide the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, *but only* as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy." *Id.* at 395 (emphasis added in decision).  The policy also stated, "[t]he Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy." *Id.* (emphasis omitted).  (*See also* Policy (dkt. #1-1) 3.)  Unlike in this case, the title company in *Philadelphia Indemnity* agreed to provide a defense for some of the claims at issue in the underlying lawsuit, although not all.  Still, applying the "complete defense" rule generally applicable to other insurance defense claims, the district court nevertheless held that the title company breached the policy by failing to provide a defense of all claims.  *Id.* at 397.

On appeal, however, the Seventh Circuit determined in *Philadelphia Indemnity* that the complete defense rule did *not* apply in the title insurance context under Illinois law. More specifically, after reviewing Illinois cases, the court concluded that the Illinois Supreme Court would not apply the complete-defense rule to title insurance for two, core reasons.  First, as is true under Wisconsin law, the court began with the proposition that the "insurer's duty to defend is contractual" under Illinois law.  *Id.* at 399.  In light of this general proposition, the court then found that general liability policies, which "usually contain a broadly stated coverage grant," would similarly give rise to a requirement to defend "a suit," rather than specific claims.  *Id.*  In contrast, since "title insurance is much narrower," specifically limited to "defects in title, lien priority encumbrances, and other

similar title risks," the court found the defense duty provision should similarly be "limited to claims that are covered by the title policy."  *Id.* (discussing *GMAC Mortg. LLC v. First Am. Title Ins. Co.*, 985 N.E.2d 823 (Mass. 2013)).  Second, the court relied on the fact that "title related claims are discrete and can be bifurcated fairly easily from related claims," thus undermining the general rational behind the complete-defense rule in other contexts. *Id.* at 400.

Of course, the *Philadelphia Indemnity* court was applying Illinois law, while the present dispute is governed by Wisconsin law.  Still, there appears to be *no* Wisconsin cases specifically addressing whether the complete-defense rule applies in the title insurance context, and the court finds the Seventh Circuit's reasoning in *Philadelphia Indemnity* and the Massachusetts Supreme Court's holding in *GMAC Mortgage LLC*, 985 N.E.2d 823, persuasive.  First, both opinions rest on general observations about title insurance that are not specifically tied to Illinois or Massachusetts law and, in any event, apply with equal force to Wisconsin law.  Second, even if *Philadelphia Indemnity* is not binding precedent, the court is persuaded that the Wisconsin Supreme Court would not apply the complete-defense rule in the title insurance context for much the same reason:  a title policy insures against a real estate title being unknowingly encumbered, and it makes little sense to expand the duty to defend to claims having nothing to do with that narrow coverage.  On this point, therefore, the court agrees with defendant that because it was not obligated to cover *all* of the claims at issue in the underlying lawsuit, its duty to defend does not run beyond those claims it agreed to cover.

15

However, unlike in *Philadelphia Indemnity*, where the insurer accepted the defense for covered claims, this conclusion does not foreclose a finding that First American breached its duty to defend in this case. As described above, the causes of action in the underlying complaint roughly fall into two categories: (1) claims concerning fraud on the part of defendant NFP II in the transfer of NFP's assets to it in 2013, predating Badger's purchase of NFP II's assets, for which Badger is not named as a defendant; and (2) claims against Badger, a number of which rest on Badger's knowledge and involvement in the 2015 sale.

First American glosses over the first category of claims because Badger is not named as a defendant. Critically, however, the plain language of the defense provision does not require that the insured be named as a defendant to trigger a duty to defend. As quoted above, the relevant provision states that First American "shall provide for the defense of the insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured." (Policy (dkt. #1-1) 4.) In *Fifth Third Mortgage Company v. Chicago Title Insurance Company*, 692 F.3d 507 (6th Cir. 2012), the Sixth Circuit considered the same language at issue in this policy, and held that the policy required the title insurance company to provide a defense in a foreclosure action on real estate, even though the insured was *not* named as a defendant. *Id.* at 514. The court reasoned that if the insurance company had wished to limit its duty to defend to only those claims where the insured was named as a defendant, the relevant language should have read that there was a duty to defend where a third party "asserts a claim against [the insured]," whereas the language at issue in that case, as well as here, provided for a defense where "a third party 'asserts *a*

16

*claim* covered by this policy *adverse to the insured.*'" *Id.* (emphasis in original).[8]  Moreover, to the extent this is even an arguable close question, the court must follow Wisconsin courts in "adher[ing] to the general rule that ambiguities in policy language . . . are construed against the insurer." *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 830 (7th Cir. 2015).

Here, the claims asserted against NFP II and related defendants -- though not specifically asserted against Badger -- still implicate Badger's title to the Goose Landing real estate.  As set forth above in the undisputed facts section, the underlying complaint contains several causes of action alleging that the transfer of NFP's assets, including "interests" in Goose Landing, to NFP II in 2013 was fraudulent and seeks "avoidance of the transfers," "an attachment of the interests transferred," or entering a judgment declaring the conveyances to be void, and also alleged a "defect in the Title caused by . . . fraud" or failure of the true owner "to have authorized a transfer." (Pl.'s PFOFs (dkt. #50) ¶¶ 28-33 (quoting Underlying Compl. (dkt. #1-2) (Counts Two, Three, Four, Eight, Eleven).)  Relatedly, in Count Fifteen, the underlying plaintiffs assert a claim for unjust enrichment based on Badger having acquired property that the underlying plaintiffs allege is rightfully theirs; in Count Seven, the underlying plaintiffs assert a claim of conversion based on these same facts; and in Count Seventeen, the underlying plaintiffs seek a

---

[8] Defendant attempts to distinguish *Fifth Third* on the basis that the underlying complaint in that case did not allege fraudulent conduct on the part of the insured.  (Def.'s Opp'n (dkt. #54) 30.)  But this distinction is immaterial in light of Wisconsin courts' instruction that an underlying complaint must be parsed to consider whether the duty to defend (or any exclusion to that duty) is triggered on a claim by claim basis.  (*See infra* pp.19-21.)  As was the case in *Fifth Third*, the underlying complaint still seeks remedies that would implicate Badger's title as to those claims for which Badger is not named as a defendant.

constructive trust, including the property held by Badger.  (*Id.* ¶ 35.)  All of these causes of action implicate Badger's title to interests in Goose Landing, at least the real estate which is the subject of the title insurance policy issued by First American.[9]

Moreover, requiring a defense against claims based on defects to the title before Badger's acquisition of the real estate at issue falls squarely within the purpose of title insurance.  *Philadelphia Indem.*, 771 F.3d at 399-400 (explaining that "title insurance is fundamentally different from general lability insurance in that it is aimed at risks that are already in existence on the date the policy is issued rather than at future risks") (internal quotation marks and citation omitted).  Indeed, First Amendment was arguably in the best position to "attempt to eliminate or reduce risks prior to the issuance of a title insurance policy."  *Id.* at 400 (internal quotation marks and citation omitted); *see also BB Syndication Servs.*, 780 F.3d at 827 (observing that unlike most other insurance, title insurance "generally protects against defects in title that arose *prior to* the issuance of a policy, allowing the insurer to reduce or eliminate risk by conducting a careful title search to identify defects").  As such, the court concludes that these causes of action fall within the policy's coverage grant.  Therefore, the court must determine whether a policy exclusion

---

[9] Defendant asserts that since some of the claims in the underlying complaint -- namely, tortious interference, conspiracy, unjust enrichment and disgorgement -- only seek money damages, these claims do not implicate the title to the Goose Landing real estate.  (Def.'s Opening Br. (dkt. #46) 29.)  In the court's review of the underlying complaint, it is not clear that this is accurate.  For example, under count ten (tortious interference), the underlying plaintiffs seek a constructive trust, cross-referencing count seventeen, which implicates *all* assets held by Badger.  (Underlying Compl. (dkt. #1-2) ¶¶ 389, 439-41.)  The court will take up this argument at trial in determining the portion of the underlying complaint that is subject to defendant's duty to defend.

precludes coverage.  *Water Well Sols.*, 2016 WI 54, ¶ 16 (citing *Sustache*, 2008 WI 87, ¶ 23).

Defendant relies on exclusions of coverage for defects to the title that were "created, suffered, assumed or agreed to by the Insured Claimant" or where " the transaction vesting the Title . . . is a fraudulent conveyance or fraudulent transfer."  (Policy (dkt. #1-1) 3.) The causes of action concerning NFP II's fraudulent transfer of NFP's assets to itself in 2013, however, do not implicate or otherwise rely on *any* allegation that Badger assumed or agreed to this fraud, nor do these claims rest on a finding that the subsequent transfer of title in Goose Landing to Badger was a fraudulent conveyance or transfer.  In other words, to state these claims against the other, underlying defendants, the underlying plaintiffs need not and did not allege any involvement -- fraudulent or otherwise -- on the part of Badger that would fall within the stated exclusions.  Thus, First American is simply engaged in hyperbole in asserting, as it does repeatedly in briefing, that "[e]very cause of action in the underlying complaint is based on allegations that:"

> Badger was a knowing and active participant in the fraudulent transfer of the Goose Landing Property to Badger; Badger purchased the property with actual knowledge that the seller did not have good title to the Property; Badger had actual knowledge and understood the "risks" of "obvious title defects" in the Property but nevertheless chose to proceed with the purchase of the Property for its own financial gain; Badger obtained a significant price concession due to the "known" title issues; Badger insisted that $8.5 million of the purchase price be escrowed to indemnify Badger against anticipated lawsuits arising from the transaction; and that Badger was "willing to self-insure the known risk" with a "drastically below-market purchase price.

(Def.'s Opp'n (dkt. #54) 1-2.)   To the contrary, relying on Wisconsin cases considering

an analogous exception -- the "knowing violation" exception -- the court agrees with plaintiff that the four corners of the claims that do not require a showing of knowledge or fraudulent actions on the part of Badger plainly do *not* implicate the exceptions First American relied on in denying a defense.  *See, e.g.*, *West Bend Mut. Ins. Co. v. Ixthus Med. Supply, Inc.*, 2019 WI 19, ¶ 28, 385 Wis. 2d 580, 923 N.W.2d 550 (rejecting application of "knowing violation" exclusion, explaining "an allegation of willful conduct in a complaint . . . does not destroy potential coverage when the complaint contains a covered claim that does not require proof of a knowing violation" (internal citation and quotation marks omitted)); *Air Eng'g*, 2013 WI App 18, ¶ 25 (finding the "knowing violation" exclusion inapplicable where liability does not depend "on a showing of a knowing violation of another's rights"); *Acuity v. Ross Glove Co.*, 2012 WI App 70, 344 Wis. 2d 29, 817 N.W.2d 455 (holding that the knowing violation exclusion did not preclude a duty to defend because the complaint also alleged liability under the Lanham Act, a strict liability statute, where "intent is not a required element of trade dress infringement, but rather is required only to justify a request for enhanced damages or attorney fees").  Indeed, since the underlying complaint appears to allege that acquisition of the Goose Landing real estate took place by purchase from the Hoffmans *after* transfer of NFP's assets to NFP II, a fair reading may be that *all* challenges to quiet title in the real estate acquisition covered by First American's insurance are unrelated to any fraudulent transfer of "interests" in Goose Landing from NFP to NFP II.

As for the second category of claims -- those asserted against Badger concerning its involvement in the underlying allegations in 2014 and the transfer of the Goose Landing

property from NFP II to Badger in 2015 -- some certainly require an allegation of fraud on the part of Badger, and thus, would appear to fall squarely within the stated exclusions. As for these causes of action, the court agrees with defendant that it had no duty to defend. At the same time, some of the claims asserted against Badger also do *not* require a showing of knowledge. For example, neither the conversion nor unjust enrichment claims rest on an allegation of fraudulent or knowing conduct. *See Title Industry Assurance Co., R.R.G. v. First Am. Title Ins. Co.*, 853 F.3d 876, 887 (7th Cir. 2017) (under Illinois law, "Conversion is an intentional tort, but conversion does not including as an element the intent to defraud."); *Air Eng'g, Inc.*, 2013 WI App 18, ¶ 25 (explaining that "unjust enrichment requires that the defendant know that he has received a benefit," but does not "require a showing that the defendant knowingly acted to violate another's legal rights and inflict advertising injury").

The court is not unsympathetic to First American's concern with Badger's knowledge, and even arguably complicity, in NPF II's possible fraudulent transfer of assets belonging to NFP, but under the four concerns rule, here, First American was obligated to defend against those claims that did not include Badger's alleged complicity. The irony is had First American simply undertaken the defense with respect to those claims, it would be responsible for those fees and costs alone, or perhaps had it sought a stay, at minimum First American could have contested coverage. Having sat on its hands, it really has no recourse except to accept its portion of the cost of defense and resolution attributable to the title insurance coverage. Perhaps the best way to address this is in the context of deciding the subjective element of plaintiff's bad faith claim.

Both parties offered an "all or nothing" approach in their submissions. Given the number of claims at issue in the underlying lawsuit, and the court's decision to hold a trial on the bad faith claim and damages as described below, the court will also consider the portion of the underlying lawsuit First American had a duty to defend as part of that trial and, specifically, in determining damages.

## II. Bad Faith

Only plaintiff moved for summary judgment on its bad faith claim. Under Wisconsin law, "[t]he tort cause of action for bad faith arises out of a contractual arrangement but is not a contract action." *Hillgamyer v. ReliaStar Life Ins. Co.*, No. 11-CV-729-WMC, 2013 WL 12234289, at *10 (W.D. Wis. Feb. 27, 2013) (quoting *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 325 Wis. 2d 56, 76-77, 784 N.W.2d 542, 552 (2010)) (internal quotation marks omitted). Instead, "the tort of bad faith is a separate intentional wrong, which results from a breach of a duty imposed as a consequence of the contractual relationship." *Id.* (quoting *Roehl Transp.*, 325 Wis. 2d at 76-77, 784 N.W.2d at 552) (internal quotation marks omitted).

To prove a bad faith claim, an insured must "[1] show the absence of a reasonable basis for denying benefits of the policy *and* [2] the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 92, 271 N.W.2d 368, 377 (1978) (emphasis added). Thus, the test has both objective and subjective components. *Brethorst v. Allstate Prop. & Cas. Ins. Co.*, 2011 WI 41, ¶ 30, 334 Wis. 2d 23, 798 N.W.2d 467. Under this test, "a trier of fact must first determine whether the insurer acted as a reasonable insurer would have acted

22

'under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim.'" *Id.* (quoting *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 378, 541 N.W.2d 753 (1995)). "The trier of fact then must consider whether a subjective intent 'can be inferred from a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.'" *Id.* (quoting *Weiss*, 197 Wis. 2d at 378).

In response to plaintiff's motion, defendant first argues that it cannot be liable for bad faith given that it did not breach its duty to defend. (Def.'s Opp'n (dkt. #54) 31 (citing *Brethorst*, 2011 WI 41, ¶ 65 ("[B]reach of contract by an insurer is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured.").) In light of the court's finding that First American *did* breach its duty to defend, this argument obviously now gets it nowhere. However, defendant also argues that Badger hasn't met its burden of demonstrating that First American lacked a "reasonable basis" for denying benefits, and as the party seeking summary judgment on a claim for which it bears the burden of proof, plaintiff "must lay out the elements of the claim, cite the facts [that] it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

In support of its motion, plaintiff argues that the objective element is satisfied because First American "relied primarily on the 'knowing' exclusion but did not even consider whether Bader could have been found liable without proof of knowing or intentional wrongdoing." (Pl.'s Reply (dkt. #56) 9.) In other words, First American failed

to engage in the type of analysis Wisconsin courts endorsed for determining whether an exclusion covers all of the asserted claims, or only certain ones that require a showing of knowing or intentional conduct.  *See West Bend Mut. Ins. Co.*, 2019 WI 19, ¶ 28; *Air Eng'g*, 2013 WI App 18, ¶ 25; *Acuity*, 2012 WI App 70, ¶ 19.[10]

In response, defendant contends that plaintiff is required to offer expert testimony to demonstrate "what a reasonable insurer would have done under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim."  (Def.'s Opp'n (dkt. #54) 33.)  However, the Wisconsin Supreme Court in *Weiss v. United Fire & Casualty Company*, 197 Wis. 2d 365, 541 N.W.2d 753 (1995), rejected just such "a categorical requirement that the insured produce expert testimony to establish every bad faith claim against an insurer."  *Id.* at 382, 541 N.W.2d at 758.  Instead, such testimony is only required for "unusually complex or esoteric matters beyond the ken of an average juror." *Id.*, 541 N.W.2d at 759 (internal citation and quotation marks omitted).  As an initial matter, the court certainly does not find the possible application of an insurance exclusion in determining the scope a duty to defend under Wisconsin law to involve "unusually complex or esoteric matters" warranting expert testimony.  Regardless, the defendant explains neither what expert nor nature of his or her testimony would illuminate the contours of the bad faith claim at issue here.

---

[10] The court acknowledges that the Wisconsin Supreme Court's decision in *West Bend Mutual Insurance Company* post-dates First American's refusal to defend in this case, but the *West Bend* court simply embraced a rule previously articulated by the Wisconsin Court of Appeals, which rule pre-dates First American's refusal.

24

On this record, the court finds that the objective element is satisfied as a matter of law.  Still, as described above, plaintiff must also demonstrate that First American knew or recklessly disregarded that it lacked a reasonable basis for denying a defense.  On this point, plaintiff simply asserts "[i]t is clear that First American's actions were not the product of a mere oversight but, rather, at least a reckless disregard of its obligations, because First American has doubled down on those fatal flaws."  (Pl.'s Reply (dkt. #56) 10.)  This argument, however, relies on a retrospective view of the facts, and plaintiff does not provide any support for the proposition that the court can rely on defendant's conduct during litigation to find that it knew or recklessly disregarded its lack of a reasonable basis at the time it denied a defense.  On this record, therefore, the court concludes that plaintiff has not yet met its burden of demonstrating that a trier of fact could not rule in defendant's favor.  As such, the court will deny plaintiff's motion for summary judgment on the bad faith claim, while allowing plaintiff to pursue it at trial.

## III.  Damages

Apart from any damages for bad faith, plaintiff seeks two categories of damages:  (1) reimbursement of its total defense costs in the amount of $1,011,500; and (2) reimbursement of Badger's contribution to the settlement proceeds in the underlying action in the amount of $200,000.[11]  The court takes up the parties' arguments as to each

---

[11] Plaintiff also seeks its attorneys' fees and costs incurred in this lawsuit, directing the court to *Steadfast Ins. Co. v. Greenwich Ins. Co.*, 2019 WI 6, ¶ 46, 385 Wis. 2d 213, 922 N.W.2d 71, for support.  In *Steadfast*, in which the court explained that "when an insurer breaches its duty to defend, it may be liable for attorney fees incurred by its insured in successfully establishing coverage."  Unfortunately for defendant, its citations to Wisconsin cases in which the court concluded that a party had no right to attorney's fees are generally distinguishable.  For example in

category below.

## A. Defense Costs

As detailed above in the fact section, plaintiff submits evidence of the attorneys' fees and costs it incurred in defending the underlying action, consisting of: (1) $832,377.78 in payments to DeWitt; (2) $46,620.00 in payments to Badger's outside, retained counsel Chier; (3) $18,802.94 in payments to the law firm Gray Reed for its role in transitioning work to DeWitt related to Gray Reed's prior representation of Badger in a related Texas lawsuit; and (4) $113,699.32 in payments to the John T. Boyd Company for an expert opinion. With respect to an award of fees and costs, the parties' dispute primarily concerns whether the court should factor in reimbursement payments plaintiff received from other sources to cover defense costs. Specifically, there is no dispute that plaintiff received the following payments: (1) $160,501.66 from its primary, general liability insurer, Hartford Insurance Company of the Midwest; and (2) $779,561.12 from an escrow account established as part of the 2015 Asset Purchase Agreement to cover Badger's possible defense costs arising out of its acquisition of the assets from NPF II. The parties' dispute over the treatment of these payments turns on the application of Wisconsin's "collateral source rule" to the breach of a duty to defend claim in the insurance context.

---

*Reid v. Benz*, 2001 WI 106, 245 Wis. 2d 648, 629 N.W.2d 262, the insurer relied on the Wisconsin court's approach of allowing an insurer to contest coverage through intervention, bifurcation and a stay, thus avoiding a breach, and a basis for awarding attorneys' fees of the insured in establishing coverage. Here, the court has now concluded that First American breached it duty to defend, and under *Steadfast Insurance*, plaintiff's attorneys' fees incurred in this litigation may be awarded. The court will, however, take up any request for such an award in a post-judgment motion for fees.

Generally, the collateral source rule provides that an injured party's recovery of damages should not be reduced by amounts received from collateral sources. *See generally* III Russell M. Ware, The Law of Damages in Wisconsin, Ch. 33 (6th ed. 2014). The Wisconsin Supreme Court formally adopted this rule in *Cunnien v. Superior Iron Works Co.*, 175 Wis. 172, 188, 184 N.W. 767 (1921). Since then that rule has developed to "provide[] that the damages to be awarded to an injured person are not to be affected by the fact that the claimant received compensation from other sources, such as sick leave, compensation, or insurance." *Payne v. Bilco Co.*, 54 Wis. 2d 424, 433, 195 N.W.2d 641, 647 (1972).

As plaintiff points out, Wisconsin has further extended the rule in the insurance context, albeit with respect to a contract claim for uninsured motorist coverage. *See Orlowski v. State Farm Mut. Auto. Ins. Co.*, 2012 WI 21, 339 Wis. 2d 1, 810 N.W.2d 775. In *Orlowski*, the Court identified three policies justifying the extension of the collateral source rule to the insurance context:

> First, is to deter a tortfeasor's negligent conduct by placing the full cost of the wrongful conduct on the tortfeasor. Second, is to fully compensate the injured party. Third, is to allow the insured to receive the benefit of the premiums paid for coverage that he or she had the foresight to purchase.

*Id.* ¶ 18 (internal citations and quotation marks omitted). From these policies, the *Orlowski* court reasoned that application of the rule -- even considering the insurer's concerns about the insured receiving a windfall -- was warranted because the insured "had paid a premium to State Farm to recover the reasonable value of her medical expenses under her UIM coverage. Since Orlowski has paid a premium from both of these policies, she should

27

receive the benefit from both." *Id.* ¶ 27.

For its part, defendant relies on cases from other jurisdictions, rejecting the application of the collateral source rule in the insurance context. (Def.'s Opp'n (dkt. #54) 35-36.) Of course, those cases are examining the application of the rule under other state's laws, not Wisconsin. In light of the Wisconsin Supreme Court's holding in *Orlowski*, and the obvious application of its reasoning to the insurance dispute here, the court is not in a position to follow guidance from other jurisdictions, even if, as defendant represents, those opinions reflect the perspective of the "overwhelming majority" of cases. (*Id.* at 35.)

Still, while the court is inclined to apply the collateral source rule to this case, the court will hear argument from the parties before doing so, particularly since an even stronger case can be made for applying the rule if the court finds in favor of plaintiff on its bad faith claim. Accordingly, the court will reserve on this issue as part of its summary judgment decision.

In addition to the application of the collateral source rule, the parties also briefed the reasonableness of plaintiffs' requested attorneys' fees and costs, although defendant stops well short of offering a robust challenge to the reasonableness of these fees and costs. Instead, defendant (1) points out a couple of time entries in the DeWitt submission concern work completed on this litigation rather than on the underlying defense and (2) challenges Attorney Chier's purported allocation of a portion of his monthly retainer to his role in that defense. Regardless, as this court explained in *BB Syndication Services, Inc. v. First American Title Insurance Company*, No. 10-CV-195-WMC, 2013 WL 11322616 (W.D. Wis. Jan. 11, 2013), in reviewing a similar award for damages for breach of a duty to

28

defend, "[t]he court's review will not impose any stringent standard for reasonableness, but will confirm that the hours and rates billed were paid by the client, and that billed hours correspond to work performed in defen[se]." *Id.* at *16. Thus, except for excluding the two charges identified in DeWitt's time entries and hearing testimony regarding Chier's method for apportioning his time, there appear no material disputes as to the reasonableness of defense costs actually paid by plaintiff.

As described above, however, because defendant only had a duty to defend those claims raised in the underlying action covered by title insurance, the court is still not in a position to award *all* of the plaintiff's other attorneys' fees and costs at this time. Instead, the court must engage in an analysis akin to determining attorneys' fees under 42 U.S.C. § 1988, where a party has only prevailed on some of their claims, as described by the Seventh Circuit in *Richardson v. City of Chicago, Ill.*, 740 F.3d 1099, 1103 (7th Cir. 2014). Accordingly, the parties should be prepared to address this issue at trial.

**B. Settlement Payment**

Plaintiff also seeks reimbursement of the $200,000 paid to settle the underlying action and obtain a clean title to the Goose Landing real estate. In support of its claim for reimbursement, Badger notes that: "Insurers are not allowed to contest coverage *after* a court has determined that the insurer has breached the duty to defend its insured because, having breached a contractual obligation, the insurer must pay damages flowing from that breach." *Marks v. Houston Cas. Co.*, 2016 WI 53, ¶ 72, 369 Wis. 2d 547, 881 N.W.2d 309 (emphasis in original). Here, too, the court will need to determine what portion of that settlement payment reflects claims for which First American was required to provide

29

coverage.  As such, the court declines to grant plaintiff's motion for summary judgment on this element of relief, and it will take up this issue at the May 3, 2020, trial as well.

ORDER

IT IS ORDERED that:

1) Plaintiff Badger Mining Corporation's motion for partial judgment on the pleadings (dkt. #28) and motion for summary judgment (dkt. #48) is GRANTED IN PART, RESERVED IN PART, AND DENIED IN PART as set forth above.

2) Defendant First American Title Insurance Company's motion for summary judgment (dkt. #45) is GRANTED IN PART, RESERVED IN PART, AND DENIED IN PART as set forth above.

3) Defendant's motion for hearing (dkt. #60) is DENIED.  The court will take up arguments at the May 3, 2020, court trial.

Entered this 14th day of April, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

30